1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Luz Hellman,                          )    No. CV-06-1465-PHX-FJM
                                           )
10               Plaintiff,                )    **ORDER**
                                           )
11   vs.                                   )
                                           )
12                                         )
     Sheldon Weisberg, and the State of    )
13   Arizona,                              )
                                           )
14               Defendants.               )
                                           )
15   _____

16

17        This is an action by Luz Hellman against Judge Sheldon Weisberg pursuant to 42

18   U.S.C. § 1983, alleging violation of her First Amendment rights, and against the State of

19   Arizona under Title VII, 42 U.S.C. § 2000e, and the Arizona Civil Rights Act, A.R.S. §§ 41-

20   1461-67, alleging retaliation.[1]

21        The court has before it the State of Arizona's motion for summary judgment (doc. 54),

22   plaintiff's response and cross-motion for summary judgment (doc. 111), the State's response

23   (doc. 134) and reply (doc. 121), and plaintiff's reply (doc. 147).  We also have before us

24   defendant Weisberg's motion for summary judgment (doc. 55), plaintiff's response and

25

26        [1]In interpreting the Arizona Civil Rights Act, Arizona follows Title VII. See Higdon
27   v. Evergreen Int'l Airlines, Inc., 138 Ariz. 163, 165 n.3, 673 P.2d 907, 909 n.3 (1983).
     Therefore, we consider these claims together.
28

1  cross-motion for summary judgment (doc. 77), Weisberg's response (doc. 139) and reply

2  (doc. 138), and plaintiff's reply (doc. 146).  We also have defendants' motion to dismiss the

3  emotional damages claim (doc. 87), defendants' motion to strike (doc. 130), two unopposed

4  motions by defendants to supplement their motion to dismiss (docs. 128, 143), and

5  defendants' unopposed motion for leave to file supplemental authority in support of their

6  motion for summary judgment (doc. 148).

**I**

8  Hellman worked at the Arizona Court of Appeals as a judicial assistant to Judge

9  Jefferson Lankford.  She married him in 2001, and then resigned.  In 2003, she rejoined the

10  court to work as a judicial assistant to Judge Donn Kessler.  She stated that she was "finally

11  in a position to get some things changed around here," that she was going to "stir the pot,"

12  "do something about Judge [Susan] Ehrlich," and was "in the process of contacting Judge

13  Ehrlich's former law clerks."  DSOF ¶ 4.

14  In 2005, Hellman met Regina Pangerl, a law clerk for Judge Ehrlich.  Pangerl told

15  Hellman that Judge Ehrlich had made discriminatory comments about Pangerl's Mormon

16  religion.  Hellman took it upon herself to contact Keith Stott, the Executive Director of the

17  Arizona Commission on Judicial Conduct, to discuss the matter.  She later accompanied

18  Pangerl to meet with Stott so that Pangerl could file a complaint against Judge Ehrlich.

19  Eventually, Pangerl transferred from Judge Ehrlich's chambers to Judge Weisberg's

20  chambers for the remainder of her clerkship term.  On November 4, 2005, Pangerl filed a

21  charge of discrimination with the Equal Employment Opportunity Commission ("EEOC")

22  against the State of Arizona, claiming religious discrimination and harassment by Judge

23  Ehrlich.

24  On November 23, 2005, Judge Weisberg, then Chief Judge of the Arizona Court of

25  Appeals, wrote a memorandum informing his judicial colleagues of Pangerl's EEOC claim.

26  Judge Weisberg's memorandum was marked "CONFIDENTIAL" and provided, "[o]f course,

27  it goes without saying, that this is a confidential matter."  PSOF, exhibit D.  He stated that

28  "[b]ased upon the information and knowledge available to me, I do not believe any of

1

2

3

4

5

6

7

8

9

Pangerl's allegations." Id. He asked the other judges to "contact [him] immediately if [they had] any information relevant to Pangerl's Charge of Discrimination." Id. The memorandum was delivered to each Court of Appeals judge in an envelope marked "confidential." On November 25, 2005, Judge Lankford wrote a memorandum in response to Judge Weisberg's, which he delivered in an envelope marked "confidential." On November 27, 2005, without obtaining permission from either judge, Hellman made copies of the Weisberg and Lankford memoranda and gave them to Pangerl. The next day an Associated Press reporter contacted Judge Weisberg about the judges' memoranda, and later that day an Associated Press story revealed content from both memoranda.

10

11

12

13

14

15

16

After the memoranda were delivered to Pangerl and leaked to the press, Hellman arranged a meeting with Judges Weisberg, Kessler, and Gemmill to confess her role in the leak. She tape-recorded the meeting without the judges' knowledge or consent. She admitted that she understood that she was "gonna get the eye from a lot of people, and [was] okay with that." PSOF ¶ 15. She was insolent and rude to Judge Weisberg and called the Court of Appeals a "gutless court that has very little integrity." DSOF ¶ 17. She displayed a shockingly inappropriate understanding of her role at the court.

17

18

19

20

21

22

In response to her misappropriation and disclosure of the memoranda, Judge Weisberg informed the other judges that only Judge Kessler, her direct supervisor, had disciplinary power over her. Exercising remarkable restraint, Judge Kessler chose not to terminate her for her gross insubordination. Many employers would have escorted her out of the building. He did conclude that her release of the two court memoranda violated the Arizona Code of Conduct for Judicial Employees[2] and Rule 123, Rules of the Arizona Supreme Court,[3] both

23

24

25

26

27

28

---

[2]Canon 3 of the Arizona Code of Conduct for Judicial Employees provides, "[a] judicial employee shall not disclose any confidential information received in the course of official duties, except as required in the performance of such duties, or use such information for personal gain or advantage." DSOF ¶ 27, exhibit J. Compliance with the Code of Conduct is a condition of continued employment. PSOF ¶ 28.

The Federal Code of Conduct for Judicial Employees, Canon 3(D), imposes identical confidentiality obligations on federal judicial employees. ("A judicial employee should never disclose any confidential information received in the course of official duties except

1   of which require employees and judges to maintain the confidentiality of court and personnel

2   information.  Judge Kessler informed Hellman that her disclosure of confidential court

3   memoranda could be deemed theft under state law, DSOF ¶ 32, and stated that he would put

4   a note in her personnel file regarding the incident.

5        Hellman claims that she suffered retaliation as a result of disclosing the memoranda.

6   She claims that she was reprimanded, threatened with termination and criminal prosecution,

7   and shunned by her co-workers.  She complained to Judge Kessler about a hostile and

8   retaliatory work environment.  Judge Kessler in turn reported the complaints to Judge

9   Weisberg.  Hellman claims to have experienced gastrointestinal problems, stress, and other

10   medical problems.

11        On January 5, 2006, Hellman filed a charge of discrimination with the EEOC claiming

12   retaliation for engaging in protected activity, which she described as "providing two

13   memorandums [sic] to an employee who had filed a charge of discrimination with the

14   EEOC."  PSOF, exhibit J.  The Court of Appeals engaged an independent lawyer to

15   investigate Hellman's allegations.  That lawyer concluded that Hellman's retaliation

16   allegations were unsubstantiated.  DSOF ¶ 24.  In late September 2006, Hellman resigned

17   as a result of the "continued ostracization that she suffered."  PSOF ¶ 138.

**II**

19        Hellman alleges that, in violation of Title VII, 42 U.S.C. § 2000e-3(a), the State of

20   Arizona retaliated against her for disclosing the confidential memoranda.  Title VII's anti-

21   retaliation provision makes it unlawful for an employer to discriminate against any employee

22

23   as required in the performance of such duties, nor should a judicial employee employ such
24   information for personal gain.")

25        [3]Under Rule 123, Rules of the Supreme Court of Arizona, a court employee is
26   required to segregate documents containing confidential information from the public record
     and closes from inspection "records maintained concerning individuals who are employees,"
27   as well as "[a]ll notes, memoranda or drafts thereof prepared by a judge . . . and used in the
     course of deliberations on . . . administrative matters."  Rule 123(c)(2)(A), (e)(1), (e)(8)(B),
28   Rules of the Supreme Court of Arizona.

1   in retaliation for either (1) "oppos[ing] any practice made an unlawful practice by [Title VII]"

2   ("opposition clause"); or (2) "participat[ing] in any manner in an investigation, proceeding,

3   or hearing under this subchapter" ("participation clause").  Id.  To establish a prima facie

4   claim of retaliation under either clause, Hellman must show that (1) she engaged in a

5   protected activity, (2) she suffered an adverse employment action, and (3) there was a causal

6   link between the protected activity and the adverse action.  Poland v. Chertoff, 494 F.3d

7   1174, 1179-80 (9th Cir. 2007).  The State argues that she neither engaged in protected

8   activity under Title VII, nor suffered a cognizable adverse employment action.  We agree.

**A**

10   In her January 5, 2006, EEOC charge of discrimination, Hellman asserted that she

11   engaged in protected activity "by providing two memorandums [sic] to an employee who had

12   filed a charge of discrimination with the EEOC."  PSOF, exhibit J.[4]  She contends that this

13   activity is protected under the participation clause because she was assisting in establishing

14   Pangerl's EEOC claim.

15   In order to determine whether an employee's conduct is "protected activity" under

16   Title VII, we must balance "the purpose of the Act to protect persons engaging reasonably

17   in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie

18   the hands of employers in the objective selection and control of personnel."  O'Day v.

19   McDonnell Douglas Helicopter Co., 79 F.3d 756, 763 (9th Cir. 1996) (analyzing a claim of

20   protected activity under the ADEA) (quoting Wrighten v. Metro. Hosps., Inc., 726 F.2d

22   [4]Hellman now claims that she engaged in two other forms of protected activity,
namely (1) making statements to the Arizona Commission on Judicial Conduct ("CJC") and
23   (2) filing a charge of discrimination with the EEOC.  Neither of Hellman's two EEOC
charges identified "statements to the CJC" as protected activity.  Because this claim has not
24   been administratively exhausted, it is not properly before us.

25   While filing an EEOC charge is a protected activity, Hellman did not allege retaliation
for filing an EEOC charge until her response to the State's motion for summary judgment.
26   She did not seek leave to amend her complaint to assert this claim.  Nonetheless, even if we
agreed that Hellman's retaliation claim was properly premised upon her filing an EEOC
27   charge, the outcome would be the same because she suffered no adverse employment action.
28   See infra section IIB.

1    1346, 1355 (9th Cir. 1984) (Title VII case)).  An employee's activity is protected only if it

2    is "reasonable in view of the employer's interest in maintaining a harmonious and efficient

3    operation."  Id. (quoting Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978)); see also

4    Jefferies v. Harris County Cmty. Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980) (activity

5    must be "reasonable in light of the circumstances").

6         Activity in violation of employee rules of conduct is not "protected activity" under

7    Title VII.  For example, in Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253 (4th

8    Cir. 1998), a case strikingly similar to ours, the court found that the unauthorized copying

9    and release of confidential information to a co-worker in support of the co-worker's potential

10   EEOC claim was not protected activity.  The court "easily conclude[d] that the employer's

11   interest in maintaining security and confidentiality of sensitive personnel documents

12   outweighs Laughlin's interest in providing those documents to [the co-worker]."  Id. at 260.

13   The court reasoned that given the employer's "reasonable and significant interest in

14   preventing the dissemination of confidential personnel documents," the employer's decision

15   to terminate Laughlin was "sound."  Id.

16        Similarly, in Jefferies, the court held that the employee's unauthorized copying of

17   confidential documents, even for the purpose of opposing employment discrimination,

18   interfered with the employer's "legitimate and substantial interest in keeping its personnel

19   records and agency documents confidential."  615 F.2d at 1036.  Absent evidence that the

20   documents would have been destroyed, or that the available grievance procedure was

21   inadequate, the court concluded that disclosing the documents was not protected activity.

22   Id.

23        In O'Day, the court rejected a claim of protection under the opposition clause of the

24   Age Discrimination in Employment Act ("ADEA").  79 F.3d at 763-64.  Applying Title VII

25   retaliation standards to the ADEA claim, the court held that an employee's conduct in

26   stealing sensitive personnel documents was not protected activity even where the employee

27   alleged he was preserving evidence for his future lawsuit against the company.  In balancing

28   an employer's interest in "maintaining a harmonious and efficient workplace" with the

1   protection afforded by the anti-discrimination laws, the court stated, "we are loathe to

2   provide employees an incentive to rifle through confidential files looking for evidence that

3   might come in handy in later litigation.  The opposition clause . . . is not a license to flaunt

4   company rules or an invitation to dishonest behavior."  Id.

5         Without citation to any authority, Hellman suggests that opposition clause cases are

6   distinguishable from her claim brought under the participation clause.  She urges a sweeping

7   interpretation of the protection available under the participation clause, noting that Congress

8   chose to protect employees who "participate[ ] in *any* manner" in an EEOC investigation.

9   42 U.S.C. § 2000e-3(a) (emphasis added).  We reject the strained suggestion that the

10  language "participate in any manner" was intended to protect all conduct associated with an

11  EEOC proceeding, including conduct that violates an employee's duty of confidentiality and

12  honesty.  "An employee is not protected by Title VII when he violates legitimate company

13  rules, knowingly disobeys company orders, disrupts the work environment of his employer,

14  or willfully interferes with the attainment of the employer's goals."  Unt v. Aerospace Corp.,

15  765 F.2d 1440, 1446 (9th Cir. 1985).  This is true of both opposition and participation clause

16  cases.  See Mattson v. Caterpillar, Inc., 359 F.3d 885, 891 (7th Cir. 2004).  A contrary rule

17  would allow an employee to "immunize his unreasonable and malicious [acts] simply by

18  filing a discrimination complaint with a government agency."  Id.; see also Wrighten, 726

19  F.2d at 1355-56 (holding that "conduct of a disruptive nature, may exceed statutory

20  protection"); Silver, 586 F.2d at 141 (holding that "the means of opposition . . . must be legal

21  and reasonable in view of the employer's interest in maintaining a harmonious and efficient

22  operation") (citation omitted).

23        Hellman contends that her disclosure of the two memoranda did not violate any rule

24  of conduct because the judges themselves did not treat the memoranda as confidential.  She

25  alleges that Judge Weisberg discussed "all of the same information" contained in his

26  November 23, 2005 memorandum with Judge Ehrlich's husband, Mr. Hair.  This contrived

27  argument fails because the conversation between Mr. Hair and Judge Weisberg occurred in

28  February 2005, nine months before the memorandum was written.  Moreover, dealing with

1   the information was within the scope of Judge Weisberg's duties as a judge.  In contrast,
2   Hellman arrogated unto herself responsibilities that were not hers.

3   She also claims the memoranda lacked confidentiality because Judge Kessler allowed
4   her to read Judge Weisberg's memorandum, and Judge Lankford let her read both Judge
5   Weisberg's memorandum and his own response.  But Judges Kessler and Lankford shared
6   the memoranda with Hellman, a court employee, who was subject to the confidentiality
7   obligations imposed on all court personnel.  That disclosure does not defeat confidentiality.
8   Moreover, neither Judge Kessler, Judge Lankford, nor anyone else, gave Hellman permission
9   to disclose memoranda that were clearly marked "confidential."  DSSOF ¶ 23.

10   Hellman argues that she was authorized to release the documents because Canon 3 of
11   the Arizona Code of Conduct for Judicial Employees authorizes disclosure of confidential
12   information to a law enforcement agency, and that the EEOC acts as a law enforcement
13   agency.  But Hellman gave the documents to Pangerl, not a law enforcement agency.  She
14   placed no restrictions on Pangerl's use of the documents, DSSOF ¶¶ 27-28, and Pangerl did
15   not give the documents to the EEOC for over a month.  DSSOF ¶ 44.

16   Finally, Hellman claims that she was motivated to misappropriate the memoranda
17   because she believed the Court of Appeals would not conduct an adequate investigation.  She
18   contends that this belief justified her release of the documents, even if they were confidential.
19   She presents no evidence, however, to suggest that the memoranda would have been
20   destroyed or hidden.  The fact that the memoranda were available from other legitimate
21   sources, including Judge Lankford and every other Court of Appeals judge, negates her
22   justification for breach of her confidentiality obligations.  Again, she was exercising a role
23   that was not hers.

24   In sum, Hellman released confidential memoranda in clear violation of her employee
25   obligations.  The Court of Appeals had a legitimate and substantial interest in maintaining
26   the confidentiality of personnel records, as well as inter-office communications between
27   judges.   Therefore, her unauthorized appropriation, copying, and dissemination of
28   documents, without a showing that disclosure was necessary to preserve the documents, is

1 not protected activity. Her Title VII claim fails on this basis alone. Title VII does not protect

2 conduct that is otherwise unlawful or in violation of the employee's obligations to the

3 employer.

**B**

5 We also conclude that Hellman has failed to establish that she suffered an adverse

6 employment action. The United States Supreme Court recently considered the degree of

7 harm required for an adverse action to fall within the scope of the anti-retaliation provision

8 of Title VII. In Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2409 (2006),

9 the Court held that the anti-retaliation provision "covers those (and only those) employer

10 actions that would have been materially adverse to a reasonable employee." Id. In order to

11 "separate significant from trivial harms" and inconvenience, Title VII protects individuals

12 "not from all retaliation," but only from "retaliation that produces an injury or harm." Id. at

13 2414-15.

14 Hellman contends that she suffered adverse employment action in the form of (1)

15 threats of termination and criminal prosecution, (2) verbal reprimands by Judge Kessler, (3)

16 criticism by Judge Gemmill that she was untrustworthy, (4) suggestions by Judge Kessler

17 that she not attend court events, and (5) ostracism by other staff and judges. Hellman claims

18 that Judge Weisberg first threatened to unilaterally terminate her, and once he concluded that

19 he did not have the authority to do so, he sought to pressure Judge Kessler to terminate her.

20 Although Hellman was threatened with termination and criminal prosecution, she was

21 remarkably neither terminated nor prosecuted. It is undisputed that, other than verbal

22 reprimands from Judge Kessler, she was not disciplined for disclosing the confidential

23 memoranda. While Judge Kessler chose not to terminate her, Title VII was not intended to

24 chill justifiable discipline. The fear of litigation is an unintended consequence of remedial

25 legislation such as Title VII, and at times deters employers from taking action that is

26 otherwise indicated.

27 Judge Weisberg left her discipline to Judge Kessler. He never threatened to fire her.

28 Even if he had, he had every reason to do so. Unfulfilled threats of termination and

1  speculation about possible discipline do not constitute adverse employment action.  Nunez

2  v. City of Los Angeles, 147 F.3d 867, 874-75 (9th Cir. 1998) (stating that a supervisor's

3  "scolding . . . and threatening to transfer or dismiss" an employee are not adverse

4  employment actions).  The judges' indirect threats of termination and criminal prosecution

5  are insufficient to support a Title VII retaliation claim.

6        Similarly, neither Judge Kessler's reprimand, nor Judge Gimmel's criticism

7  constitutes adverse employment action.  Title VII does not insulate an employee from

8  criticism, particularly where, as here, the criticism is warranted.  Oncale v. Sundowner

9  Offshore Servs., Inc., 523 U.S. 75, 80-81, 118 S. Ct. 998, 1002-03 (1988) (holding that Title

10  VII does not impose a "general civility code"); Brooks v. City of San Mateo, 229 F.3d 917,

11  929 (9th Cir. 2000) ("badmouthing" an employee does not constitute adverse employment

12  action).  In short, the court's weak response to her egregious misconduct would not have

13  deterred a reasonable employee from engaging in justifiable protected activity.

14        Finally, Title VII does not protect an employee from "mere ostracism" in the

15  workplace.  Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000); Brooks, 229 F.3d at 929

16  (ostracism suffered at the hands of coworkers does not constitute an adverse employment

17  action).  Co-worker snubbing, antipathy, petty slights, minor annoyances, and simple lack

18  of good manners are not actionable.  Burlington, 126 S. Ct. at 2415.  Nor does Title VII cover

19  "every offensive utterance by co-workers, because offensive statements by co-workers do

20  not reasonably deter employees from engaging in protected activity."  Ray, 217 F.3d at 1243.

21  Indeed, Hellman admits that she was not dissuaded by the potential consequences of her

22  actions. She acknowledged that she "wasn't concerned with what other people would think,"

23  DSSOF ¶ 25; she expected some adverse reaction to her conduct and was "okay with that."

24  PSOF ¶ 15.   Despite this knowledge, Hellman was undeterred from disclosing the

25  confidential documents. The judges and employees justifiably lost confidence in her ability

26  to respect them and the institution.  Their reaction was the natural and probable consequence

27  of her conduct.  It was naive of her to have expected anything less.  Her ostracism was self-

28  imposed.

**III**

Hellman's claim under 42 U.S.C. § 1983 against Judge Weisberg asserts that he violated her First Amendment rights when he retaliated against her for disclosing the confidential memoranda. To establish a claim under the First Amendment, Hellman must show that (1) she engaged in constitutionally protected speech; (2) Judge Weisberg took adverse employment action against her; and (3) her protected speech was a "substantial or motivating" factor in the adverse action. Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977).

Two inquiries guide interpretation of the First Amendment protection afforded public employee speech. Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). The first considers whether the employee's speech involves a matter of public concern. If the answer is no, the employee's First Amendment claim fails. Id. (citing Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983)). If the answer is yes, the question becomes whether the employee's interest in speaking on matters of public concern is outweighed by the employer's interest in promoting the efficiency of the public service it performs. Id. This recognizes that government agencies have broader discretion to regulate the speech of their employees than the speech of private citizens because the government has a significant interest in discharging its public duties efficiently. Connick, 461 U.S. at 140, 103 S. Ct. at 1686. "[W]here the government is employing someone for the very purpose of effectively achieving its goals, . . . restrictions [on speech] may well be appropriate." Waters v. Churchill, 511 U.S. 661, 675, 114 S. Ct. 1878, 1888 (1994).

Whether a public employee's expressive conduct addresses a matter of public concern is determined in light of "the content, form, and context" of the expressive conduct. Connick, 461 U.S. at 147-48, 103 S. Ct. at 1690. "[W]hen government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, their speech is inherently a matter of public concern." Alpha Energy

1  Savers, Inc. v. Hansen, 381 F.3d 917, 926 (9th Cir. 2004) (citation omitted).  This applies to

2  litigation seeking to expose discrimination by public officials, "whether it consists of a single

3  act or a pattern of conduct."  Id.

4        Hellman contends that her disclosure of the two memoranda was protected speech

5  because they addressed claims of discrimination, other misconduct, and potential

6  mismanagement by elected officials in investigating claims.  We conclude that Hellman's

7  disclosure of the two confidential memoranda is only marginally related to issues of public

8  concern.  First, on its face, Judge Weisberg's memorandum exhibits no misconduct.  He

9  stated that "[b]ased upon the information and knowledge available to me, I do not believe

10  any of Pangerl's allegations."  PSOF, exhibit D.  Hellman's argument that this statement

11  revealed that Judge Weisberg was improperly biased, had unfairly prejudged Pangerl, and

12  was attempting to smear her reputation is not reasonably supported by the plain language of

13  the memorandum.  Judge Weisberg was entitled to express his opinion to his colleagues

14  about Pangerl's claim.  His opinion is prefaced with the caveat that it is "[b]ased upon the

15  information and knowledge available to [him]," without suggesting, as Hellman alleges, that

16  Judge Weisberg had conducted a full investigation.  Judge Weisberg supported a continuing

17  investigation by asking the other judges to "contact [him] immediately if [they had] any

18  information relevant to Pangerl's Charge of Discrimination."  Id.  The memorandum cannot

19  reasonably be construed as exhibiting an effort by Judge Weisberg to cover up or ignore

20  Pangerl's claim, or government wrongdoing.  He was discharging his duties by keeping his

21  judicial colleagues advised of matters important to them.

22        Hellman contends that Judge Lankford's memorandum suggested that Judge Ehrlich

23  had engaged in a pattern of misconduct at the Court of Appeals and that some of the judges

24  knew of the misconduct, but did nothing to correct it.  Judge Lankford stated that he was

25  "extremely concerned that an ethical violation probably had occurred and that prior . . .

26  reports of misbehavior involving Judge Ehrlich were more likely to be true."  PSOF, exhibit

27  D.  He also expressed concern that the court was aware of Judge Ehrlich's misconduct, but

28  failed to take action against her.

1          We cannot say that Judge Lankford's memorandum is "utterly devoid of public

2   concern." Voigt v. Savell, 70 F.3d 1552, 1560 (9th Cir. 1995).  The public has an interest

3   in knowing whether its public officials treat employees in accordance with the law.

4   However, this does not end our inquiry.  "[T]he 'public concern' prong is a necessary, but

5   not a sufficient, condition of constitutional protection.  It merely brings the claim within the

6   'coverage' of the First Amendment." Gilbrook v. City of Westminster, 177 F.3d 839, 867

7   (9th Cir. 1999).  Therefore, we apply the Pickering test and balance Hellman's interest in

8   commenting on such matters against the Court of Appeals' interest in efficiently and

9   effectively discharging its public service.

10          The critical question in applying the Pickering test is whether the employee's speech

11   has undermined "the effective functioning of the public employer's enterprise." Rankin v.

12   McPherson, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987).  "In conducting this balancing,

13   courts must give government employers 'wide discretion and control over the management

14   of [their] personnel and internal affairs.  This includes the prerogative to remove employees

15   whose conduct hinders efficient operation and to do so with dispatch.' " Gilbrook, 177 F.3d

16   at 867 (quoting Connick, 461 U.S. at 151, 103 S. Ct. at 1692).  Factors include whether the

17   speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii)

18   erodes a close working relationship premised upon personal loyalty and confidentiality, (iv)

19   interferes with the speaker's performance of her or his duties, or (v) obstructs the routine

20   operation of the office. Rendish v. City of Tacoma, 123 F.3d 1216, 1224-25 (9th Cir. 1997).

21          The time, place, and manner of the employee's speech is relevant to whether the

22   employer's operational efficiency was disrupted. Voigt, 70 F.3d at 1561.  In Pickering, the

23   Court noted that there might be some instances where speech, even if protected, might

24   substantially disrupt "the kind of close working relationships for which it can persuasively

25   be claimed that personal loyalty and confidence are necessary to their proper functioning."

26   391 U.S. at 570, 88 S. Ct. at 1735.  The "paradigm example of an environment in which a

27   close working relationship is essential to perform successfully the public function" is the

28   chambers of a judge. Gregorich v. Lund, 54 F.3d 410, 417 (7th Cir. 1995).

1          Here, Hellman did not simply reveal information she gathered about a co-worker's

2  discrimination claim. Rather, she did so by misappropriating and then disclosing confidential

3  memoranda between judges.  In an environment where preservation of confidentiality is

4  fundamental to the employer's operations, that sort of "speech" is highly disruptive.

5  Hellman's chosen method of speech was unprofessional, disrespectful, and violated clearly

6  established codes of conduct.  Her method of speech caused significant disruption, including

7  the deterioration of interpersonal relationships and the creation of mistrust and concern

8  among other judges about the risks of sharing confidential information with the chambers in

9  which she worked.  DSSSOF ¶¶ 112-119.  Hellman admits that other judges avoided sharing

10 confidential information with or visiting Judge Kessler's chambers and that they expressed

11 concern that she would divulge confidential court information.  Id. ¶ 113.  Judge Weisberg

12 was not required to "tolerate action which he reasonably believed would disrupt the office,

13 undermine his authority, and destroy close working relationships." Connick, 461 U.S. at 154,

14 103 S. Ct. at 1694.  We conclude that the Pickering balancing test strongly favors Judge

15 Weisberg and that Hellman has failed to establish that she engaged in constitutionally

16 protected speech.  A lawful end does not justify an unlawful means.

17         Moreover, we conclude that, even if Hellman had engaged in protected speech, she

18 suffered no adverse employment action.  In a First Amendment retaliation case, a cognizable

19 adverse action is "an act that is reasonably likely to deter employees from engaging in

20 constitutionally protected speech." Coszalter, 320 F.3d at 970.  Where an employer's actions

21 include "only minor acts, such as 'bad-mouthing,' that cannot reasonably be expected to

22 deter protected speech, such acts do not violate an employee's First Amendment rights." Id.

23 at 975-76 (citing Nunez, 147 F.3d at 875).  We have already determined that court reaction

24 to her disclosures was unbelievably restrained.  Hellman was aware that her release of the

25 documents would result in negative fallout, but that did not deter her.  She suffered no

26 cognizable adverse employment action.

27         Finally, Hellman has not shown that her "speech" was a "substantial or motivating

28 factor" in any adverse action taken against her.  Her allegedly protected speech involved the

1 disclosure of confidential court documents.  Where "the use of such inappropriate means of

2 expression–rather than the speech itself–prompts discipline, there is no first amendment

3 violation."  <u>Wagner v. City of Holyoke</u>, 404 F.3d 504, 508 (1st Cir. 2005).  Hellman has

4 failed to show that any adverse action was motivated by her "speech," rather than her

5 unauthorized disclosure of confidential court documents.

6       We conclude that Hellman has failed to establish that she engaged in protected activity

7 by disclosing the confidential memoranda or that she suffered a cognizable adverse

8 employment action.  Therefore, her section 1983 claim fails.

9 **IV**

10       **IT IS ORDERED GRANTING** defendant State of Arizona's motion for summary

11 judgment (doc. 54) and **DENYING** Hellman's cross-motion for summary judgment (doc.

12 111).

13       **IT IS FURTHER ORDERED GRANTING** defendant Weisberg's motion for

14 summary judgment (doc. 55) and **DENYING** Hellman's cross-motion for summary judgment

15 (doc. 77).

16       **IT IS FURTHER ORDERED DENYING** defendants' motion to dismiss the

17 emotional distress damages claim as moot (doc. 87), and **DENYING** defendants' motions

18 to supplement their motion to dismiss as moot (docs. 128, 143).

19       **IT IS FURTHER ORDERED GRANTING** defendants' motion to file supplemental

20 authority (doc. 148), and **DENYING** defendants' motion to strike as unauthorized by the

21 Federal Rules of Civil Procedure (doc. 130).

22       The clerk shall enter final judgment for defendants.

23       DATED this 29th day of November, 2007.

24

25                 _Frederick J. Martone_

                   Frederick J. Martone

26                  United States District Judge

27

28